MILLS v. THE EAST TENN., VA. & GA. RAILWAY CO.

Under the facts of this case, as disclosed by the record, it was error to grant a nonsuit.

March 30, 1891.

Nonsuit. Railroads. Master and servant. Negligence. Before Judge MARSHALL J. CLARKE. Fulton superior court. September term, 1890.

Reported in the decision.

ARNOLD & ARNOLD and M. H. BLANDFORD, for plaintiff.

A. O. BACON and DORSEY, BREWSTER & HOWELL, for defendant.

LUMPKIN, Justice.

George Lawshe, a flagman on a freight-train of the E. T., V. & G. Ry. Co., whose duties were "on or about the rear end of the train," was killed in a collision in the night-time, caused by the running of the engine of a passenger-train into the rear end of the freight-train. His widow, who is now Lula Mills, brought suit against the railway company for the killing of her husband, on the trial of which a nonsuit was granted by the court below, and this judgment is now before this court for review. The plaintiff's evidence made substantially the following case: The accident occurred at Braswell station, some 50 feet north of which is a trestle more than a hundred feet long. The road has a heavy up grade coming from the north to this station, and from that direction the top of a car standing on the end of the trestle could be seen 160 or more yards before reaching it. A train running up this grade at the rate of thirty miles an hour could be stopped within 50 yards. The freight-train upon which Lawshe was employed as flagman was going south, and had reached Braswell after 12 o'clock on the night of the accident. The engine of

that train had been derailed, and while efforts were being made to get it back upon the track, the train of freight-cars unavoidably remained on the main line, and occupied the trestle.  It was known to the employees having charge of this freight-train that the south-bound passenger-train was approaching and would be due in about an hour and a half.  The conductor of the freight-train told Lawshe to go back and put torpedoes on the track, and then, as he had worked hard, was tired and needed rest, to go into the cab and go to sleep, stating, also, that he (the conductor) would have him waked up in time to flag the approaching passenger-train.  On the morning succeeding the accident, the remains of an exploded torpedo were found on the track about 150 yards north of the trestle.  The conductor instructed one Mills, the front brakeman, to go back to the cab and wake Lawshe and tell him to go and flag the passenger-train.  Mills went twice in the direction of the cab into which Lawshe had gone, and shouted the conductor's message to Lawshe, but it does not appear that Lawshe heard him, or that he awoke, if he was asleep. Lawshe certainly did not come out of the cab, and never went back to flag the passenger-train.  In one or two minutes after Mills had called Lawshe the second time, the engine of the passenger-train, running at a high rate of speed, struck the cab and demolished it, ran through one other car, and into a third.  Lawshe was thrown out of the cab and killed.  His body was found on the ground below the trestle, wrapped in a blanket in which he had doubtless been asleep.  There was also evidence to show that a torpedo, when exploded, made a noise louder than a gunshot, and that it could be heard for half a mile.  The following rules of the company were put in evidence:

"Rule 31.  An explosive cap, or torpedo, placed on the rail, is a signal to be used in addition to the regular

signals. The explosion of *one* torpedo is a *signal to stop* immediately; the explosion of *two* torpedoes is a signal to *reduce speed* immediately, and look out for a danger signal.

"Rule 99a. All trains will approach stations with great care, expecting to find the main track occupied between the station limits. . . *The responsibility for accidents between limit posts (or switches), or at fuel and water stations, will rest with approaching trains."*

As will be seen, the evidence is quite meagre as to the extent and nature of the duties of Lawshe, as flagman. About all that can be gathered from the record on this subject must be taken from the conversation had between him and the conductor, in connection with the fact that his duties, whatever they were, were to be performed "on or about the rear end of the train." Whether his duties were fixed by the rules of the company which he, as well as the conductor, was bound to obey, or were prescribed by the conductor himself, does not appear from the evidence. In the absence of distinct proof upon this subject, and in view of the fact that the conductor was the chief officer in charge of the train, and was giving orders to Lawshe, we cannot presume the existence of any rules or regulations prescribed by an officer of the company superior in authority to these men, and equally binding on both of them, but must conclude that Lawshe had to look to the conductor alone for instructions and commands regulating his duties. Just here, it seems to us, is the key to a proper determination of the question, whether or not a nonsuit should have been granted.

In the case of the *Georgia R. R. & Bkg. Co.* v. *Mc-Dade*, 59 *Ga.* 73, it was held, in effect, that where a rule was prescribed for railroad employees by a common superior, one of them could not plead, as a justification for violating such rule, the orders of the other; and, therefore, an engineer could not excuse himself

for running contrary to a schedule fixed by the company's rules, on the ground that he had been ordered to do so by the conductor. In the absence of a rule or regulation prescribed by such superior officer, addressed to and binding alike on subordinates, the doctrine seems to be well-settled that a conductor has the charge and control of all persons employed on his train, and that they are bound to obey *his* orders. In the case of the C., M. & St. P. R. R. Co. *v.* Ross, 112 U. S. 390, Justice Field said: "We know from the manner in which railroads are operated that, subject to the general rules and orders of the directors of the companies, the conductor has entire control and management of the train to which he is assigned. He directs when it shall start, at what speed it shall run, at what stations it shall stop, and for what length of time, and everything essential to its successful movements, and all persons employed on it are subject to his orders. In no proper sense of the term is he a fellow-servant with the fireman, the brakeman, the porters and the engineer. The latter are fellow-servants in the running of the train under his direction; as to them and the train, he stands in the place of and represents the corporation." This doctrine has also been recognized by this court in *Prather* v. *R. & D. R. R. Co.*, 80 *Ga.* 436, wherein Justice SIMMONS remarked: "The conductor was in charge of the train . . . He represented the company. It was his right and duty to give all necessary orders for the protection of the interests of the company and the safety of its servants." Other authorities could be cited, but the above are doubtless sufficient to support a proposition so well-founded in common sense and experience.

It follows, then, so far as this record discloses, that Lawshe was under the orders of the conductor, and therefore was justified in obeying any reasonable com-

mand of the latter. Of course, he would not have been justified in recklessly exposing himself to danger, although commanded so to do; but do the facts of this case so conclusively show that he did this as to leave nothing for a jury to pass upon in this connection? Are not the facts disclosed such as to make it proper for a jury to decide this question? In the first place, it may be assumed that Lawshe knew of that rule of the company which required all passenger-trains to approach stations with great caution, and he had a right to assume that this rule would be observed, unless some other rule, directly binding on him, provided, either in terms or by necessary implication, that he should not rely implicitly on the employees of the passenger-train, but must himself do certain things to prevent accident in case they disregarded the rule as to the manner of approaching stations. He doubtless was also aware of the fact that a freight-car standing on the trestle could be seen a considerable distance, and that a train coming up that grade, even at a high rate of speed, could easily be stopped in time to avoid a collision. In the second place, if the plaintiff's inference from the testimony as to the torpedo is correct, Lawshe also knew that one of these explosives had been placed by himself on the track, which ought to have warned the approaching passenger-train of danger and caused it to stop. And in the third place, being doubtless worn out and fatigued, he had the command of his superior officer to enter the cab and go to sleep, and that officer's assurance that he should be awakened, not only in time to prevent harm to himself, but also in time to go back upon the track and give warning to this expected train. And he may have felt the greater security because the conductor seemed satisfied with the existing situation, and to apprehend no danger. In view of all these facts, ought a *court* to say that his conduct was reckless, and,

therefore, he was guilty of negligence? Our judgment is that this question had better be left for solution to a jury. As we have already intimated, if the evidence showed that it was the duty of this flagman, under any rule of the company prescribed by an officer superior both to himself and the conductor, and binding directly on the flagman himself, to go back on the track and flag this passenger-train, we would hold that he had no right to obey the conductor's order to go into the cab, or any other order of the conductor which conflicted with the duty he ought to perform under such rule made by the superior officer. The argument of the learned and able counsel for the railway company proceeded upon the assumption that it was the duty of the flagman to go back and flag the passenger-train, and that some rule of the company of higher authority than any order which the conductor could give prescribed this duty. We have carefully examined the pleadings and the evidence to ascertain whether or not this assumption is borne out thereby, but we have been unable to find in the record anything showing how the flagman's duties were defined or regulated, otherwise than by the orders of the conductor.

Without expressing any opinion as to the merits of this case, we leave it to be investigated in the court below, feeling assured that, after both sides have been fully heard and all the facts brought out, a jury can determine more accurately than ourselves, or the learned trial judge, whether or not the deceased was guilty of negligence in the calamity which caused his death, this being the main and vital question to be decided.                    *Judgment reversed.*